UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

SAMAD DAROUIAN,
    Plaintiff

v.

HP HOOD, INC.,[1] TOM MEDLOCK,
NED KERSHNER, NANCY CARROLL,
AND MARGARET POOLE,
    Defendants.

CIVIL NO. 302CV927(RNC)

July 15, 2004

## LOCAL RULE 56(a)(1) STATEMENT

Pursuant to Local Rule of Civil Procedure 56(a)(1), the Defendants, HP Hood LLC ("HP Hood"), Tom Medlock, Ned Kershner, Nancy Carroll, and Margaret Poole, hereby assert the following material facts that are not in dispute for purposes of their Motion for Summary Judgment:

### About The Parties

1.     Plaintiff is a white male and was born in Armenia on September 1, 1940 (age 63). (Compl. ¶ 9; Pl. Dep. at 16, 171, 224).[2]

---

[1] Plaintiff's former employer and the proper Defendant is HP Hood LLC, which was formerly known as HP Hood Inc. On April 5, 2004, the company changed its name to HP Hood LLC. There no longer is a legal entity with the name "HP Hood Inc."

[2] The Affidavit of Tasos C. Paindiris, Esq. was filed simultaneously herewith. Paragraphs of the Paindiris Affidavit are hereinafter referenced as "Paindiris Aff. ¶ __;" documents appended to the Paindiris Affidavit are hereinafter referenced as "Paindiris Aff. Exhibit __." A copy of the Amended Complaint is attached as Exhibit 1 to the Paindiris Affidavit, and hereinafter referenced as "Compl ¶ __." Certified copies of relevant pages from Plaintiff deposition transcripts are attached to the Paindiris Affidavit as Exhibit 2. Plaintiff's deposition is hereinafter referenced as "Pl. Dep. at __."

2.  Plaintiff began employment with HP Hood at the company's Agawam, Massachusetts facility in 1981 and he transferred to the Suffield, Connecticut plant in 1982. (Compl. ¶ 10; Pl. Dep. At 130).

3.  Plaintiff became a laboratory technician in about 1983. (Pl. Dep. At 130-131). As a full-time laboratory technician, Plaintiff's essential job functions included: testing of all raw product received at the plant to determine whether it is suitable for use in the plant; proficiency in all testing procedures used in the lab including fat, solids, DMC, acidity, and antibiotic testing; testing of all finished product for fats, solids viscosity, sucrose, vitamin c, homogenizer efficiency, phosphatase; testing for HP Hood's weekly compliance program; and other miscellaneous tasks. (Pl. Dep. At 381; Paindiris Aff. Exhibit 3 - Laboratory Technician job description).

4.  Plaintiff learned how to perform the laboratory technician position through training provided by HP Hood. (Pl. Dep. at 131).

5.  HP Hood produces a variety of dairy and some non-dairy products. (Compl. ¶ 11). The company's plant in Suffield, Connecticut primarily produces ice cream products. (Compl. ¶ 11).

6.  Tom Medlock is a white male and was born in the United States on December 23, 1947 (age 56.) (Compl. ¶ 12; Pl. Dep. at 181; Affidavit of Tom Medlock ¶ 2).[3]

7.  Mr. Medlock worked for HP Hood from August 1992 as a Quality Control Supervisor on the first shift until he resigned in November 1998. (Medlock Aff. ¶ 3). Mr. Medlock had supervisory responsibility over the laboratory employees on the first shift, including Plaintiff, during that time. (Medlock Aff. ¶ 4).

---

[3] The Affidavit of Tom Medlock was filed simultaneously herewith. Paragraphs of the Medlock Affidavit are hereinafter referenced as "Medlock Aff. ¶ __."

8. On June 21, 1999, Mr. Medlock was rehired as the laboratory manager at HP Hood and his title is Quality Control Manager. (Pl. Dep. at 202; Medlock Aff. ¶ 5). Mr. Medlock had supervisory responsibility over the laboratory employees on the first shift, including Plaintiff, beginning in June 1999 and he reports to Dr. Margaret Poole. (Medlock Aff. ¶ 6; Pl. Dep. at 170-171).

9. Ned Kershner is a white male and was born in the United States on October 29, 1942 (age 61). (Compl. ¶ 13; Affidavit of Ned Kershner ¶ 2).[4] Mr. Kershner was employed by HP Hood as the Director of Human Resources from June 1965 until he retired from the company on June 4, 2004. (Pl. Dep. at 169; Kershner Aff. ¶ 3).

10. Nancy Carroll is a white female and was born in the United States on January 21, 1962 (age 42). (Compl. ¶ 14; Affidavit of Nancy Carroll ¶ 2).[5] Ms. Carroll began working for HP Hood in February 1981. Until June 1996, Ms. Carroll worked as a Quality Assurance Technician for HP Hood. (Carroll Aff. ¶ 3). Ms. Carroll was promoted to senior laboratory technician in 1996 and to lead laboratory technician in 1998. (Carroll Aff. ¶ 4). Ms. Carroll began supervising Complainant in 1996 and she reports directly to Tom Medlock. (Compl. ¶ 14; Pl. Dep. at 169-171).

11. Dr. Margaret Poole is a white female and was born in the United States on May 2, 1957 (age 47). (Compl. ¶ 15; Affidavit of Margaret Poole ¶ 2).[6] Dr. Poole is employed by HP Hood as the Vice President of Research and Development. (Pl. Dep. at 170-171; Poole Aff. ¶ 3).

---

[4] The Affidavit of Ned Kershner was filed simultaneously herewith. Paragraphs of the Kershner Affidavit are hereinafter referenced as "Kershner Aff. ¶ __."

[5] The Affidavit of Nancy Carroll was filed simultaneously herewith. Paragraphs of the Carroll Affidavit are hereinafter referenced as "Carroll Aff. ¶ __."

[6] The Affidavit of Margaret Poole was filed simultaneously herewith. Paragraphs of the Poole Affidavit are hereinafter referenced as "Poole Aff. ¶ __."

**Plaintiff's Performance Issues Prior to 1996**

12. Beginning in 1982, numerous former supervisors of Plaintiff documented his performance problems. (Paindiris Aff. Exhibit 4 - documentation of verbal warning dated May 20, 1982; Exhibit 5 - written verbal warning dated Sept. 15, 1982; Exhibit 6 - disciplinary action memo dated April 18, 1984; Exhibit 7 - documentation of performance problem dated March 30, 1992).

13. Although Mr. Medlock began supervising Plaintiff in 1992, Plaintiff does not allege any purported harassing or discriminatory conduct prior to 1996. (Pl. Dep. at 100; Medlock Aff. ¶ 4).

**Plaintiff's Employment from 1996 to 1998**

14. Plaintiff alleges that he was previously promoted to the position of lab inspector and then demoted in 1996 when the lab inspector position was eliminated. (Pl. Dep. at 132-133). Plaintiff alleges he complained to Mr. Kershner that Mr. Medlock discriminated against him on the basis of his national origin because of the alleged demotion. (Pl. Dep. at 200). Mr. Kershner investigated Plaintiff's allegation and determined that there was no basis for Plaintiff's claim. (Kershner Aff. ¶ 4).

15. In 1996, Plaintiff was employed as a laboratory technician. (Pl. Dep. at 133).

16. In February 1996, Plaintiff received a performance evaluation of "needs improvement." (Pl. Dep. at 272; Paindiris Aff. Exhibit 8 - performance evaluation dated Feb. 5, 1996). Plaintiff alleges that Mr. Medlock's failure to rate him the maximum performance rating constitutes a poor evaluation, and he would have rated himself the maximum rating for most of the items but for cost control. (Pl. Dep. at 275-276). Plaintiff believes that he received a poor evaluation because Mr. Medlock did not like him. (Pl. Dep. at 272).

4

17. Plaintiff does not allege any negative performance evaluations from Mr. Medlock in either 1997 or 1998. (Pl. Dep. at 136).

**Plaintiff's Employment in 1999**

18. In March 1999, the laboratory supervisor, Rich Brown, documented an incident which occurred on February 20, 1999. (Paindiris Aff. Exhibit 9 - documentation of performance problem dated March 5, 1999). Plaintiff called Mr. Brown at home on a Saturday morning stating that he was having a problem with some test results. (Paindiris Aff. Exhibit 9). Mr. Brown was unable to resolve the issue over the telephone with Plaintiff and had to go to the plant where he discovered that Plaintiff had failed to properly run the procedure in the laboratory although Mr. Brown had gone over the procedure with Plaintiff the day before. (Paindiris Aff. Exhibit 9). As a result, Mr. Brown determined that Plaintiff's "performance of his duties were not acceptable." (Paindiris Aff. Exhibit 9).

19. Plaintiff states that Mr. Brown is an American in his late 40s. (Pl. Dep. at 313). Plaintiff does not allege that Mr. Brown discriminated against him on any basis and describes him as "honest" and "a good man" who is "not [a] liar" and "[does not] lie." (Pl. Dep. at 28-29, (Q: "Do you think that [Mr. Brown] discriminated against you?" A: "no."), 148-149).

20. On May 1999, Plaintiff had a meeting with Mark Syrett (then Quality Control Manager), Mr. Brown, and Ms. Carroll because Plaintiff had accused Ms. Carroll of harassing him when she asked him to answer the phone. (Pl. Dep. at 369; Paindiris Aff. Exhibit 10 - documentation of meeting on May 4, 1999). At this time, Mr. Medlock did not work for HP Hood. (Pl. Dep. at 370; Medlock Aff. ¶¶ 3, 5). Mr. Syrett and Mr. Brown determined that Plaintiff had not been harassed, but rather he was alleging "common

5

everyday issues that were misunderstandings or normal mistakes or responses." (Paindiris Aff. Exhibit 10).

21. Mr. Medlock returned to HP Hood as the Quality Control Manager in June 1999. (Medlock Aff. ¶ 5).

22. When Mr. Medlock evaluated Plaintiff's performance in October 1999, he consulted with Mr. Brown and Ms. Carroll and asked them both to sit in on the evaluation because they had worked and trained Plaintiff in Mr. Medlock's absence. (Medlock Aff. ¶ 7; Paindiris Aff. Exhibit 11 - memorandum from Tom Medlock to Ned Kershner dated Nov. 19, 1999). After consulting with Mr. Brown and Ms. Carroll, Mr. Medlock rated Plaintiff as "needs improvement." (Pl. Dep. at 135; Paindiris Aff. Exhibit 12 - performance evaluation dated Oct. 29, 1999).

23. Plaintiff disagreed with his October 1999 performance evaluation and asked for additional training. (Medlock Aff. ¶ 7). Mr. Medlock agreed to provide additional training and asked Plaintiff whom he wanted as his trainer. (Medlock Aff. ¶ 8). Plaintiff chose Mr. Brown to train him. (Pl. Dep. at 243). Plaintiff never asked Mr. Medlock to train him. (Pl. Dep. at 243). Mr. Medlock agreed to allow Mr. Brown to train Plaintiff. (Medlock Aff. ¶ 9).

24. Plaintiff received training prior to November 1999. (Pl. Dep. At 148). Between November 1, 1999, and November 16, 1999, Plaintiff received additional training from Mr. Brown on the testing system and formulations. (Pl. Dep. at 146, 235; Paindiris Aff. Exhibit 13 - written warning signed by Rich Brown on Nov. 16, 1999).

25. On November 16, 1999, Mr. Brown issued a written warning to Plaintiff for using "poor technique" when performing tests, failing to "successfully complete and send a formula

6

for batching," obtaining "questionable results," and failing to properly develop formulas. (Pl. Dep. at 147; Paindiris Aff. Exhibit 13). Mr. Brown also told Plaintiff that he "would not feel comfortable if [Plaintiff] were in the lab alone and had to handle all situations." (Pl. Dep. at 147; Paindiris Aff. Exhibit 13).

26. On November 18, 1999, Ms. Carroll also documented Plaintiff's poor technique in performing laboratory testing procedures. (Paindiris Aff. Exhibit 14 - documentation by Nancy Carroll dated Nov. 18, 1999).

27. On November 30, 1999 and December 7, 1999, Mr. Brown provided Plaintiff with more training on testing procedures. (Paindiris Aff. Exhibit 15 - memorandum signed by Rich Brown on March 22, 2000).

**Plaintiff's Employment in 2000**

28. On January 24, 2000, Mr. Brown provided Plaintiff with a written warning for using the wrong procedure in a laboratory test for pasteurization. (Pl. Dep. at 137; Paindiris Aff. Exhibit 16 - written warning signed by Rich Brown on Jan. 24, 2000).

29. Plaintiff says he received the wrong result because he used a chemical that had been stored at the wrong temperature. (Pl. Dep. At 155-156). Upon receipt of an abnormal test result, the laboratory's standard operating procedure is to open a new bottle of the testing chemical and retest the product. (Pl. Dep. at 281). Plaintiff failed to do so and admits, "[he] didn't follow the procedure." (Pl. Dep. at 281).

30. After receiving the January 2000 written warning, Plaintiff was required to do additional training. (Pl. Dep. at 149). Plaintiff requested permission from Mr. Medlock to perform the training with Mr. Brown on the second shift. (Pl. Dep. at 149-150). Mr. Medlock granted this request and Plaintiff was trained by Mr. Brown. (Pl. Dep. at 149).

7

31. On March 7, 2000, Mr. Medlock decided that Plaintiff and another laboratory technician should continue training in mix formulation procedures on a daily basis. (Paindiris Aff. Exhibit 17 – memoranda from Tom Medlock dated March 7, 2000; and March 7, 2000, March 31, 2000, and April 3, 2000).

32. Prior to March 24, 2000, Plaintiff received four days of training by Mr. Brown on the second shift. (Pl. Dep. at 251-252; Paindiris Aff. Exhibit 15).

33. On March 24, 2000, Plaintiff filed a charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). (Compl. ¶ 18(a); Paindiris Aff. Exhibit 18 - Plaintiff's Connecticut Commission on Human Rights Complaint Case No. 0010354 signed on March 24, 2000). No one discouraged Plaintiff from making a complaint or threatened him with termination because he filed a complaint. (Pl. Dep. at 324-325).

34. After filing his CHRO complaint, Plaintiff received additional training from the company to help him improve his performance. (Pl. Dep. at 322; Paindiris Aff. Exhibit 16).

35. On March 31, 2000, Ms. Carroll documented Plaintiff's inability to apply proper formulas, noting that Plaintiff "seems to have a hard time remembering how to change and calculate a formula from day to day." (Paindiris Aff. Exhibit 19 - documentation by Nancy Carroll on March 31, 2000). Ms. Carroll stated that Plaintiff needed additional training although she had spent nine hours training Plaintiff in the three weeks prior to March 31, 2000. (Paindiris Aff. Exhibit 19).

36. On April 3, 2000, Mr. Medlock authorized two weeks of training with Mr. Brown and Ms. Carroll. (Paindiris Aff. Exhibit 17).

37. On May 1, 2000, Plaintiff reported a positive test result to Ms. Carroll showing that the product was not pasteurized. (Carroll Aff. ¶ 5). As a result of the positive test result, the

production line was shut down for approximately 20 minutes. (Carroll Aff. ¶¶ 6-7; Medlock ¶¶ 11-12). Due to the 20-minute shutdown, approximately 100 employees stopped working and production was decreased by about 1,200 containers of product. (Carroll Aff. ¶ 7; Medlock Aff. ¶ 12).

38. Plaintiff was not blamed for mistake on May 1, 2000, but rather, everyone believed that the third shift night cleanup crew was at fault for not properly cleaning the machine. (Pl. Dep. at 175, 177, 316). Upon review, when Ms. Carroll retested the mix and applied the correct test, she discovered that Plaintiff applied the wrong test to the product and accordingly, received the wrong result. (Carroll Aff. ¶ 8; Medlock Aff. ¶ 13). The product was properly pasteurized. (Pl. Dep. at 307-308; Carroll Aff. ¶ 9).

39. On September 14, 2000, Plaintiff reported a butterfat test result to Ms. Carroll showing that the product had an improper amount of butterfat. (Carroll Aff. ¶ 10). Ms. Carroll repeated the test and received a different result which showed that the product's amount of butterfat was within acceptable margins. (Carroll Aff. ¶ 11). Mr. Medlock authorized the release of the product. (Medlock Aff. ¶ 14). Butterfat affects the taste of the product and an improper amount of butterfat is neither unsafe nor unsanitary. (Pl. Dep. at 319).

40. Plaintiff complained to Scott Blake, HP Hood's Vice President of Operations, that Ms. Carroll changed the numbers of the butterfat test result. (Pl. Dep. at 175). At no time did he allege that the testing method was improper. (Pl. Dep. at 332). Plaintiff did not allege any improper tests or test results to anyone outside of HP Hood. (Pl. Dep. at 334).

41. Mr. Blake reported Plaintiff's allegation to Dr. Poole, HP Hood's Vice President of Research and Development. (Pl. Dep. at 175).

42. On October 2, 2000, Dr. Poole met with Plaintiff to investigate his claim. (Pl. Dep. at

326-327; Poole Aff. ¶ 4).

43. During the investigation, Plaintiff told Dr. Poole that he was keeping documentation of testing procedures, formulas and results, and had saved a sample of the product. (Pl. Dep. at 318; Poole Aff. ¶ 5; Kershner ¶ 6). All such information is confidential and proprietary trade secrets of HP Hood. (Poole Aff. ¶ 6; Kershner ¶ 7). Dr. Poole explained this to Plaintiff and told him that Company policy prohibits employees from taking such information out of the plant. (Poole Aff. ¶ 7; Kershner ¶ 8). Dr. Poole asked Plaintiff to return all documentation of the testing procedures, formulas, and results to HP Hood. (Pl. Dep. at 176, 296, 305-306, 351, 353, and 361 (Plaintiff specifically alleges that Dr. Poole said, "Bring all formulation you took from lab"; "Where is the formulation? Where did you put? Where is it?"; "Where's the formulation?"; "Bring formulation here. You took formulation from lab. I want that formulation"; "where is the formulation?"; "You took formulation from lab."; "She said, You stole formulation from lab," and next day, she denied."); Poole Aff. ¶ 7; Kershner ¶ 8).

44. At no time did Dr. Poole accuse Plaintiff of stealing anything. (Poole Aff. ¶¶ 8-9; Kershner ¶¶ 9-10).

45. On or about October 13, 2000, Dr. Poole and Mr. Kershner met with Plaintiff to discuss the results of Dr. Poole's investigation into Plaintiff's claim that Ms. Carroll falsified test results. (Poole Aff. ¶ 10; Kershner Aff. ¶ 11). Dr. Poole was unable to substantiate Plaintiff's allegation. (Poole Aff. ¶ 11). At this time, Dr. Poole discussed with Plaintiff her concerns that he was not properly performing routine laboratory procedures, resulting in low quality work and inconsistent test results. (Poole Aff. ¶ 12; Kershner ¶ 12).

46. Dr. Poole made the decision to terminate Plaintiff's employment. (Pl. Dep. at 296; Poole

10

Aff. ¶ 13).

47. On December 20, 2000, Mr. Kershner and Dr. Poole met with Plaintiff to inform him that his employment was terminated due to his poor job performance. (Compl. ¶ 16; Pl. Dep. at 294-295; Poole Aff. ¶ 13; Kershner Aff. ¶ 13). No one else was present at this meeting. (Pl. Dep. at 357).

48. Plaintiff admits that he made mistakes during his employment. (Pl. Dep. at 330).

## Administrative Agency Procedure

49. Plaintiff filed a CHRO complaint, Case No. 0010354, on March 24, 2000 alleging, in part, that he was poorly evaluated, harassed, warned, not promoted, and provided with less training because of his national origin and age. (Paindiris Aff. Exhibit 18).

50. Plaintiff's complaint was dismissed because the CHRO determined that: (1) HP Hood did not deny Plaintiff training, but rather, provided him with more training than his co-workers; (2) Plaintiff's performance evaluation was not based on his national origin or age, but rather was "a result of the evaluation of [his] work performance by more than one individual; (3) Plaintiff failed to identify a specific incident showing that he was subjected to harassment because of his national origin or age; (4) Plaintiff was not treated differently from his co-workers; (5) Plaintiff was not denied a promotion because he failed to show that HP Hood has a practice of promoting its employees when there were no open positions and the alleged promotion denied occurred in 1998 and was thus untimely filed; (6) Plaintiff was not given warnings for discriminatory reasons but rather, Plaintiff "admitted that errors occurred"; and (7) a review of the entire file does not support a finding that further investigation would result in a determination of a reasonable cause that illegal discrimination occurred. (Paindiris Aff. Exhibit 20 –

dismissal of Plaintiff's Connecticut Commission on Human Rights Complaint Case No. 0010354 dated Sept. 13, 2000).

51. Plaintiff's request to the CHRO for reconsideration of the dismissal was denied. (Pl. Dep. at 376-377).

52. Plaintiff filed a second CHRO complaint, CHRO Case No. 0110317, alleging that he was terminated for poor performance in retaliation for his previous filing, which was dismissed on July 10, 2001. (Paindiris Aff. Exhibit 21 – dismissal of Plaintiff's Connecticut Commission on Human Rights Complaint Case No. 0110317 dated July 10, 2001). The CHRO determined that dismissal was appropriate based on "a review of the evidence in the case file, considered in its entirety, is more likely to show that [HP Hood's] stated reason with regard to your termination, that is your documented long history of less than satisfactory performance, is true..." (Paindiris Aff. Exhibit 21).

53. Plaintiff also filed a complaint with the National Labor Relations Board ("NLRB"), Case No. 34-CA-9523, on March 2, 2001. (Paindiris Aff. Exhibit 22 – Plaintiff's Affidavit to the National Labor Relations Board dated March 2, 2001). On May 31, 2001, the NLRB determined that further proceedings on the charge were unwarranted because the NLRB's "investigation established that Mr. Darouian was terminated due to his poor performance and communication problems with his supervisor rather than his union activities." (Exhibit 23 - dismissal of Plaintiff's National Labor Relations Board Affidavit dated May 31, 2001).

54. Plaintiff appealed the NLRB's decision and the appeal was denied on October 24, 2001 because Plaintiff failed to establish a nexus between his discharge and his union activity and rather,

> [t]he evidence indicated that Mr. Darouian's discharge was based upon the quality of his work performance beginning well before his union activity and continuing until after the representation election. The evidence in this regard indicated that the Employer provided additional training to aid in Mr. Darouian's performance issues apparently without results. The evidence also indicated that Mr. Darouian's discharge was based upon continual communication problems with his supervisors and co-workers.

(Paindiris Aff. Exhibit 24 – denial of Plaintiff's appeal of dismissal of Plaintiff's National Labor Relations Affidavit dated Oct. 24, 2001).

### Alleged Denial Of A Promotion

55. Plaintiff alleges that he was denied a promotion to senior laboratory technician position six to eight years ago by Mr. Syrett (then Quality Control Manager). (Compl. ¶ 17; Pl. Dep. at 258).

56. Plaintiff admits that he never asked for a promotion or complained about not receiving a promotion. (Pl. Dep. at 262).

57. Plaintiff concedes that promotions were never automatically granted but that qualifications were required -- "Knowledge, qualification, knowledge of the job, have enough education, good job performance and responsible." (Pl. Dep. at 261-262).

58. Plaintiff admitted in his deposition that Dave Falbo should have received the senior laboratory technician position six to eight years ago and not him, because "[Mr. Falbo] was the only person qualified" for the senior laboratory technician position. (Pl. Dep. at 170, 310). Dave Falbo is an American white male in his late 30s who was employed as a second shift Senior Laboratory Technician. (Pl. Dep. at 179, 311).

### Alleged Harassment

59. According to Plaintiff, the grounds for his allegation that he was "harassed" are: (1) Ms. Carroll asked him to answer the telephone prior to May 4, 1999 (Paindiris Aff. Exhibit

10); (2) his coworkers did not say "hi" or "bye," but Mr. Medlock sometimes said "hi," (Pl. Dep. at 285-286); (3) he was isolated by a glass room divider because Mr. Medlock and Ms. Carroll placed pictures, paper towel boxes, a radio, and speakers up to cover up the window because they did not want to see him (yet the second shift laboratory technician was not a "foreigner," and worked in the same space), (Pl. Dep. at 207-208, 210); (4) "[e]verything was top secret . . . " and he was not told anything, (Pl. Dep. at 103); (5) Mr. Medlock favored Ms. Carroll over him because Mr. Medlock was friends with Ms. Carroll and Plaintiff did not drink or party with Mr. Medlock or Ms. Carroll, (Pl. Dep. at 180-181, 308-309) and (6) his belief that Defendants did not like him, (Pl. Dep. at 179-180, 256-257).

60. Plaintiff alleges that Mr. Medlock and Ms. Carroll invited him to go out to drink and party and that he declined. (Pl. Dep. at 181).

### Alleged Discriminatory Statements

61. Plaintiff is unable to identify any discriminatory statements made to him about his national origin. (Pl. Dep. at 179; Paindiris Aff. Exhibit 20).

62. Plaintiff is unable to identify any age-based discriminatory statements made to him. (Pl. Dep. at 224-225, 314).

63. In response to requests for the basis for his belief that Defendants discriminated against him, Plaintiff stated, "[b]ecause they didn't like me. They didn't want I train. There got to be some reason, my age, my origin, whatever."; "I didn't have other reason. I didn't have a tail or horns." (Pl. Dep. at 180, 256-257).

### Plaintiff's Claim under 42 U.S.C. § 1981

64. Plaintiff alleges that he was not discriminated against because of his race (white), but

14

rather, because of his national origin. (Pl. Dep. at 224, 256-257).

### Plaintiff's Claim under Conn. Gen. Stat. § 31-51q

65. Plaintiff testified that the sole basis for his claim under paragraph 26 of his Amended Complaint is that he was retaliated against for complaining on September 14, 2000 to HP Hood that Ms. Carroll changed one butterfat test result. (Pl. Dep. at 326).

### Plaintiff's Claim Of Defamation

66. Plaintiff cannot identify one person who called him incompetent as a laboratory technician. (Pl. Dep. at 341, 345, 347).

67. Plaintiff is also unable to identify any employee who was questioned about his performance. (Pl. Dep. at 359-360).

68. Plaintiff claims that other supervisors and managers thought that he made a mistake when Ms. Carroll shut down the production on May 1, 2000. Plaintiff bases this belief on his description of Ms. Carroll's actions and statements -- "Nancy called paging system, said 'Product is contaminated. Don't use it. Everybody stop.' They come over there. 'What is it?' They heard it. We open new bottle." (Pl. Dep. at 343-344).

69. Plaintiff's claim of defamation as to Dr. Poole arises out of his allegation that she falsely accused him of stealing formula at the investigatory meeting on October 2, 2000 with only Dr. Poole, Mr. Kershner, and himself present. (Pl. Dep. at 346). He is unable to identify anyone else who heard her ask him to return the formulation. (Pl. Dep. at 346).

70. Plaintiff admits Ms. Carroll never accused him of stealing it. (Pl. Dep. at 349-350).

71. Plaintiff is also unable to identify any defamatory written document which was supposedly placed in his personnel file. (Pl. Dep. at 356).

72. Plaintiff alleges that the purported rumor was that Mr. Medlock and Ms. Carroll did not

15

like him, but cannot identify who started the "rumor." (Pl. Dep. at 340-341).

73. Plaintiff admits that he never asked Defendants for a reference and Defendants did not discuss Plaintiff's job performance, discharge, or rumors about Plaintiff with any actual or potential employer. (Pl. Dep. at 341, 360; Poole Aff. ¶ 15; Kershner Aff. ¶ 15; Medlock Aff. ¶ 16; Carroll Aff. ¶ 13).

### Plaintiff's Claim Of Intentional Infliction Of Emotional Distress

74. Plaintiff's claim that Mr. Kershner intentionally inflicted emotional distress on him arises out of Mr. Kershner's 1996 investigation into Plaintiff's alleged demotion from the laboratory inspector position and determination that there was no evidence to substantiate Plaintiff's claim. (Pl. Dep. at 365).

75. Plaintiff's claim that Dr. Poole intentionally inflicted emotional distress on him arises from his allegation that she accused him of stealing HP Hood's formulations. (Pl. Dep. at 367).

76. Plaintiff alleges that Mr. Medlock and Ms. Carroll intentionally inflicted emotional distress on him because they turned their back on him, slammed the door, and did not give him phone calls. (Pl. Dep. at 368).

        DEFENDANTS,
        HP HOOD LLC, TOM MEDLOCK,
        NED KERSHNER, NANCY CARROLL
        AND MARGARET POOLE

By: _____
     Tasos C. Paindiris (ct 16739)
     Jackson Lewis LLP
     55 Farmington Avenue, Suite 1200
     Hartford, CT  06105
     Tel: (860) 522-0404
     Fax: (860) 247-1330
     paindirt@jacksonlewis.com

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent by first class mail, postage prepaid, on this 15th day of July, 2004, to the following counsel of record:

Paul M. Ngobeni
914 Main Street
Suite 206
East Hartford, CT 06108

_____
Tasos C. Paindiris

59467